IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| AMERIPRISE FINANCIAL SERVICES, INC.<br><br>Plaintiff,<br><br>v.<br><br>FINANCIAL RESOURCES OF AMERICA, INC.<br><br>Defendant. | Civil Action No. 4:08-cv-00896-GAF |

## VERIFIED COMPLAINT

COMES NOW Plaintiff Ameriprise Financial Services, Inc. ("Ameriprise Financial"), by and through its attorneys, and for its Complaint against Defendant Financial Resources of America, Inc. ("FRA") states and alleges as follows:

### PARTIES

1. Ameriprise Financial provides a variety of financial services to persons and entities nationwide. Until September 30, 2005, Ameriprise Financial was known as American Express Financial Advisors, Inc. ("AEFA"), at which point its name changed to Ameriprise Financial. References in this Complaint to Ameriprise Financial should be understood to include Ameriprise Financial and AEFA (for the time period before the name change).

2. Upon information and belief, FRA is incorporated in Illinois and is a financial services firm specializing in the financial and retirement needs of retired Americans. Upon information and belief, FRA has attempted to contact Missouri residents regarding its services.

## JURISDICTION AND VENUE

3. Personal jurisdiction is proper in this Court pursuant to the Missouri Long Arm Statute R.S. Mo. § 506.500 because FRA committed a tortious act within the state of Missouri and entered into a contract in the state of Missouri. Accordingly, it does not defeat traditional notions of fair play and substantial justice because FRA should reasonably be expected to have to answer to causes of action within the state of Missouri.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in the Western District of Missouri.

5. This Court has subject matter jurisdiction over the matter under 28 U.S.C. § 1331, 28 U.S.C. § 1338 and 15 U.S.C. § 1121 because portions of this action arise under the Trademark Act of 1946, as amended, 15 U.S.C. § 1501, et seq. (also referred to herein as the "Lanham Act").

## SUMMARY OF FACTUAL ALLEGATIONS

### Dennis Grob's Relationship With Ameriprise Financial

6. Dennis Grob is a former financial advisor with AEFA. In 1999, Grob and AEFA entered into an Independent Advisor Business Franchise Agreement ("Franchise Agreement").

7. Ameriprise Financial trained its advisors to build valuable and lasting financial planning relationships with clients and document important information about each client.

8. As a financial advisor and franchisee, Grob had access to confidential, proprietary and trade secret information, which included names, addresses, phone numbers, account information, social security information, financial plans and other information.

9. The Franchise Agreement contains numerous provisions which protect disclosure of confidential information to third parties. Specifically, under the Franchise Agreement, Grob agreed:

> "To protect client confidentiality, AEFA goodwill, trade secrets and other proprietary and confidential business information, Independent Advisor agrees to not, during the term of this agreement or thereafter, . . . divulge, or use for himself or herself except pursuant to the System, or for the benefit of any other person, partnership association, or corporation any confidential information, or trade secrets, including without limitation, client names, addresses and data . . . ."

10. Ameriprise Financial has a publicly available Privacy Policy that states that neither it nor its affiliates will disclose client confidential information to third parties except under limited circumstances.

11. Under Ameriprise Financial's Privacy Policy, "Client Information" includes, among other things, names, addresses and phone numbers.

12. Under Ameriprise Financial's Privacy Policy, Ameriprise Financial and its Affiliates pledge "to restrict access to nonpublic Client Information to those persons who need to know the information. We maintain physical, electronic and procedural safeguards to protect your Client Information. We will not sell your Client Information to anyone."

13. Grob worked for American Express for twenty-four years, and left in the spring of 2002.

14. Currently, Grob is an insurance and securities agent with New York Life.

### FRA's Privacy Policy

15. Upon information and belief, FRA's privacy policy's definition of "personally identifiable information" includes names, addresses and telephone numbers. Upon information and belief, FRA's privacy policy states that FRA will take appropriate measures to safeguard against any unauthorized disclosure of information.

16. Upon information and belief, FRA's privacy policy is posted on its company's website.

### FRA's Improper Solicitation of Confidential Client Information from Grob

17. In October 2008, Earl Whitley with Insurance Marketing Strategies, Inc. contacted Grob and asked if he would be interested in selling a listing of his client base. Whitley said he would be contacting the clients to try and sell them additional services. Upon information and belief, Insurance Marketing Strategies, Inc. is an agent of FRA and/or contacted Grob on behalf of FRA.

18. Grob informed Whitley that he was not interested in selling his current client base, but he had a list of former AEFA clients that he had previously serviced.

19. Grob told Whitley that he had not called on any of those clients since he left AEFA because of his non-compete agreement.

20. Whitley told Grob that he was interested in purchasing his former AEFA client list and that he would take whatever information Grob had regarding those clients.

21. Grob replied that he would only provide names, addresses and telephone numbers.

22. Whitley agreed to pay Grob fifteen hundred dollars for the first fifty names.

23. Grob received a document titled "Letter of Understanding Between Dennis Grob Agency (DGA) and Financial Resources, Inc. (FRA)." Before receiving the Letter of Understanding, Grob claims never to have heard of FRA.

24. The Letter of Understanding states that if any of the clients provided by Grob are not between the ages of 60 and 85 then Grob would be required to provide replacement names.

25. The Letter of Understanding also refers to the information provided as "client data information."

26. Grob signed the Letter of Understanding and then sent Whitley a Client Group List with approximately fifty names, addresses and phone numbers of his former AEFA clients located in southwestern Missouri.

27. For a few of the clients listed, however, account information and product information was not redacted.

### FRA Contacts Ameriprise Financial's Clients and Misrepresents a Relationship with Ameriprise Financial

28. FRA began to send letters to the people listed on the Client Group List that Grob sold to FRA. These letters purport to have been sent out from the Dennis Grob Agency and indicate that Grob was working with FRA. The letter contained false representations.

29. FRA also began to call clients on the Client Group List provided by Grob.

30. Doris Groves was one of the people listed on the Client Group List that Grob sold to FRA.

31. On October 28, 2008, Groves received a telephone call from someone who said she was calling about Groves's American Express accounts. The caller said that Mark Roland would be in her area and would like to go over her accounts. When Groves asked what she meant by "going over her accounts," the caller said they wanted to update her information and make sure that they had everything correct.

32. The caller pushed Groves to make an appointment, and an appointment was set for Roland to come to Groves's home on October 29, 2008, at 4:30 p.m.

33. Groves believed the person who called was affiliated with Ameriprise Financial as Groves has investment accounts with Ameriprise Financial which were purchased back when it was known as AEFA. The caller was not affiliated with Ameriprise Financial, but with FRA.

34. On the morning of October 29, 2008, Groves called her Ameriprise Financial office and was informed that Ron Penney, her financial advisor, had not transferred his accounts to another advisor.

35. Groves then checked the caller identification information for the call that she had received the day before, conducted research, and concluded that FRA was most likely the company that had placed the call to her.

36. Groves called the phone number that she had found for FRA, and the person who answered confirmed that she had indeed called FRA.

37. Groves told the FRA representative that she wanted to cancel her appointment with Mark Roland, and the FRA representative confirmed that her appointment was cancelled.

38. Mark Roland did not come to her home as originally scheduled.

39. Prior to the October 28, 2008 call from FRA, Groves does not believe that she has ever spoken with anyone at FRA.

40. Groves has never had a business relationship with FRA.

41. Groves has never had a business relationship with Mark Roland.

42. Groves has never authorized anyone to provide information about her to FRA.

43. Walter Hicks was one of the people listed on the Client Group List that Grob sold to FRA.

44. In October 2008, Hicks received a telephone call from a person who told him that his new account representative for his 401K wanted to meet with him. Upon information and belief, Hicks asked if he had a new account representative for his 401K, and the caller said yes.

45. Hicks assumed that Ameriprise Financial had assigned him a new representative. Upon information and belief, Hicks did not think it was unusual for the new representative to ask for an appointment with him because his current financial advisor with Ameriprise Financial meets with him in his home once a year.

46. When the caller tried to confirm his address, Hicks became suspicious, and told the caller that the address she gave was not current.

47. When the caller asked for his current address, Hicks told her that if you were my account representative, you would have my address.

48. Hicks then ended the call and immediately called his Ameriprise office. Upon information and belief, Hicks asked if Ron Penney was still handling his 401K. Upon information and belief, he was told that Penney was handling his account and that nothing had changed.

49. Before Penney handled Hicks's 401K, his account was handled by Grob.

50. Hicks then received a call back from the same person who had called earlier and who had told him that he had a new 401K representative. She told Hicks that his account representative would be coming by his home at a certain date and time, and then she hung up.

51. On the specified date at the specified time, a man pulled up in Hicks's driveway and started to walk onto his porch. Hicks told the man that whomever had called had misrepresented who the man was, that the man was not his account representative, and that Hicks wanted him to leave. The man told Hicks that he wanted to talk with him, and Hicks again told

7

the man to leave. The man persisted, but Hicks said he wanted him off his property, and the man finally left.

52. Carol Ann Day was one of the people listed on the Client Group List that Grob sold to FRA.

53. When FRA called Carol Ann Day, she asked FRA how it obtained her phone number and FRA stated that Grob had given FRA her phone number.

54. Day previously had never conducted business with FRA.

55. Day also did not authorize Grob nor anyone else to give her contact information to FRA.

56. Several other clients contacted their Ameriprise Financial office of to confirm if Ameriprise Financial was actually the entity that had called to set up a home visit, and Ameriprise Financial informed these clients that no one from Ameriprise Financial had called them nor sent them letters.

57. Ameriprise Financial is not associated with not working with FRA in any way.

58. Ameriprise Financial has not authorized any one to provide confidential client information including names, addresses or phone numbers to FRA.

### Grob's Relationship with FRA Sours

59. Upon information and belief, near the end of October 2008, Dave Wolf with FRA contacted Grob, and stated that several of the clients were upset by FRA's contact with them.

60. Upon information and belief, Wolf stated that FRA wanted to end the deal with Grob and wanted Grob to return FRA's money.

61. Upon information and belief, Grob then contacted Whitley via electronic mail regarding Wolf's telephone call.

62. Upon information and belief, Grob reminded Whitley that he had approached Grob, that Grob had told him upfront that he would provide a list of former clients that he serviced while with AEFA, and that the former clients were part of his non-compete with AEFA.

63. Upon information and belief, Grob agreed to return FRA's payment if FRA would return his materials.

64. Upon information and belief, on approximately October 29 or 30, FRA did return the Client Group List to Grob, and Grob then sent FRA a check for fifteen hundred dollars as refund for FRA's payment to him.

**FRA Refuses to Confirm all Materials have been Returned and Client Contact has Ceased**

65. FRA has refused to confirm with Ameriprise Financial that all original materials regarding the Client Group List have been returned, that all copies of materials regarding the Client Group List have been returned, and that all client information has been deleted from its system.

66. FRA refuses to confirm that it has stopped contacting Ameriprise Financial's clients.

67. Ameriprise Financial has made repeated attempts to contact FRA and settle this dispute amicably. Ameriprise Financial's final attempt was a letter from its counsel to FRA's counsel, but FRA failed to respond.

## COUNT I

### MISAPPROPRIATION OF TRADE SECRETS

68. Ameriprise Financial repeats and realleges Paragraphs 1 through 67 as if fully set forth herein.

69. The Client Group List that FRA solicited from Grob was a trade secret.

70. The Client Group List was not generally known nor was the list available to the public, and federal law forbids the disclosure of confidential information such as the Client Group List.

71. The Client Group List was the product of extensive effort and expense to develop client goodwill, and Ameriprise Financial derives significant economic value from the confidential nature of the information. The Client Group List is not publicly available nor is it readily ascertainable as it cannot be recreated without significant time and expense as the Client Group List only includes individuals who are already using a financial planning service, and in accordance with FRA's Letter of Understanding, included individuals in the 60 to 80 year old age bracket.

72. Ameriprise Financial took reasonable efforts to maintain the Client Group List's secrecy. The Franchise Agreement explicitly states that the "names, addresses, data and other personal and financial information recorded in the Client records are confidential." Ameriprise Financial's publicly available Privacy Policy states that client data, such as names, addresses, and phone numbers are considered confidential client information.

73. FRA misappropriated the Client Group List through improper means as it induced a breach of duty to maintain secrecy, and FRA knew or had reason to know that it acquired the list from a person who owed a duty to maintain its secrecy. Grob told FRA that he was providing information from his former AEFA Client Group List. As a financial services company, FRA would know that Grob, a former financial advisor, had a duty to maintain the secrecy of the Client Group List, and FRA would also know that federal law requires that such information be kept confidential.

10
Case 4:08-cv-00896-GAF    Document 1    Filed 11/25/08    Page 10 of 15

74. As a direct and proximate result of FRA's misappropriation of its trade secret, Ameriprise Financial will suffer irreparable harm, and damages. Ameriprise Financial will continue to suffer injury, loss, harm or damage unless and until FRA is restrained from its unlawful conduct.

## COUNT II

## INTERFERENCE WITH CONTRACT CLAIM

75. Ameriprise Financial repeats and realleges Paragraphs 1 through 74 as if fully set forth herein.

76. Grob entered into a Franchise Agreement with AEFA, which is now known as Ameriprise Financial, and under the Franchise Agreement, Grob agreed that during the term of the agreement and thereafter not to "divulge . . . any confidential information, or trade secrets, including, without limitation, Client names, addresses and data . . ." and "without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential."

77. FRA had knowledge of facts, which if it would have followed by reasonable inquiry, would have lead to a complete disclosure of the contractual relationship.

78. FRA also took active steps to induce the breach as FRA contacted Grob and solicited client information.

79. Absent this contact by FRA, the sale of the Client Group List would not have occurred and the Franchise Agreement would not have been breached.

80. FRA had no legal justification to attempt to buy confidential client information.

81. As a direct and proximate result of FRA's interference with the Franchise Agreement, Ameriprise Financial will suffer irreparable harm, and damages. Ameriprise

11
Case 4:08-cv-00896-GAF   Document 1   Filed 11/25/08   Page 11 of 15

Financial will continue to suffer injury, loss, harm or damage unless and until FRA is restrained from its unlawful conduct.

## COUNT III

## LANHAM ACT CLAIM

82. Ameriprise Financial repeats and realleges Paragraphs 1 through 81 if fully set forth herein.

83. Under the Lanham Act:

"(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, or services, or commercial activities by another person . . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C.A. § 1125(a) (West 2008).

84. FRA in connection with the financial services it offered used in commerce false and misleading representations of facts when it pretended to be associated with Ameriprise Financial.

85. FRA's misleading representations caused mistakes and deceived Ameriprise's clients as to FRA's affiliation, connection or association with Ameriprise Financial and as to the origin, sponsorship or approval of FRA's services.

86. As a direct and proximate result of FRA's violation of the Lanham Act, Ameriprise Financial will suffer irreparable harm, and damages. Ameriprise Financial will continue to suffer injury, loss, harm or damage unless and until FRA is restrained from its unlawful conduct.

WHEREFORE, Plaintiff Ameriprise Financial Services, Inc. respectfully requests this Court grant the following relief:

A.  Until a trial on the merits, enter a temporary restraining order, or in the alternative a preliminary injunction, that will restrain and enjoin FRA and its agents, servants, employees, officers, representatives, successors and assigns, and all persons, firms, and corporations acting in connection or participation with it or on its behalf ("Defendant"), as follows:

1. Defendant is ORDERED to deliver to Ameriprise Financial no later than two business days from the date of this Order all originals and copies of any information and/or data about Ameriprise Financial clients provided to FRA by Dennis Grob;

2. Defendant is ORDERED to delete any and all references to the information and/or data about Ameriprise Financial clients provided to FRA by Dennis Grob in FRA's computer and or hard copy records so that the information and/or data cannot be retrieved, no later than seven business days from the date of this Order, and certify in writing in the form of an Affidavit provided to Ameriprise Financial no later than fourteen business days that this deletion has been completed.

3. Defendant is ORDERED to certify in writing by Affidavit delivered to Ameriprise no later than five business days from the date of this Order that Defendant has not disclosed the information and/or customer data provided by Dennis Grob to FRA to any third parties, but if any such disclosure has been made to identify any such third parties who have received the information and/or customer data.

4. Defendant is ENJOINED AND REFRAINED from directly or indirectly contacting (orally or in writing) in any way any of the clients listed on the Client Group List provided to FRA by Dennis Grob; or

5. Defendant is ENJOINED AND REFRAINED from engaging in acts of unfair competition, including, but not limited to: (a) representing that FRA or representatives of FRA are working with or in any way associated with Ameriprise Financial or American Express Financial Advisors, Inc.; (b) disparaging Ameriprise Financial, its affiliates, employees, or advisors; (c) disparaging Ameriprise Financial's products and services; or (d) providing false information about Ameriprise Financial to clients.

B.  In addition, Ameriprise Financial Services, Inc. seeks the following relief including:

1. An award of compensatory damages in an amount to be determined at trial; and

2. Other such equitable and legal relief as the Court deems appropriate, including attorney's fees and costs.

### JURY DEMAND

### DEMAND IS HEREBY MADE BY PLAINTIFF FOR TRIAL BY JURY

Respectfully submitted,

LATHROP & GAGE L.C.

s/ Michael J. Abrams
Rosalee M. McNamara   Mo. Bar #33645
Michael J. Abrams     Mo. Bar #42196
Patrick L. Kenney     Mo. Bar #50205
2345 Grand Avenue, Suite 2800
Kansas City, MO 64108
(816) 292-2000
FAX (816) 292-2001
Email: rmcnamara@lathropgage.com
       mabrams@lathropgage.com
       pkenney@lathropgage.com

Edward B. Magarian
Patricia L. Houser
*Pro hac vice applications pending*
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600
FAX (612) 340-2868

**ATTORNEYS FOR AMERIPRISE FINANCIAL SERVICES, INC.**

## VERIFICATION

COMES NOW, Megan E. Notermann, Manager in Advisor Transitions Risk Mitigation and Franchise Operations for Ameriprise Financial Services, Inc. ("Ameriprise Financial") and hereby certifies that the facts set forth herein are correct to the best of Ameriprise Financial's knowledge, information and belief.

Megan E. Notermann
Dated: 11/25/08

Subscribed and sworn to before me on this 25 day of November, 2008.

THOMAS E. GOUGH
Notary Public-Minnesota
My Commission Expires Jan 31, 2012

Notary Public